NOT DESIGNATED FOR PUBLICATION

No. 114,960

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHANOC DOMENECH,
*Appellant*.

MEMORANDUM OPINION

Appeal from Lyon District Court; JEFFRY J. LARSON, judge. Opinion filed January 13, 2017. Affirmed.

*Rick Kittle*, of Kansas Appellate Defender Office, for appellant.

*Carissa E. Brinker*, assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., GREEN and LEBEN, JJ.

*Per Curiam*:  Chanoc Domenech was convicted in a nonjury trial of reckless aggravated battery under K.S.A. 2015 Supp. 21-5413(b)(2)(B). His conviction stemmed from serious injuries caused by his dog to an individual working in his home. On direct appeal, Domenech contends that the evidence was insufficient to show that his conduct was reckless since no substantial and unjustifiable risk was ever demonstrated. He further contends that even if a risk existed, the evidence presented at the bench trial failed to show that he unreasonably disregarded this risk. Finding no merit in Domenech's contentions, we affirm.

1

In 2014, Chanoc Domenech lived in Americus, Kansas, with his significant other, Cheryle Hardy. Hardy suffered from a medical condition that caused her to have seizures. Hardy's seizures ranged in severity from mild to grand mal. A grand mal seizure would result in Hardy shaking violently. Hardy suffered between three and seven seizures per month. Because Domenech was employed as an over-the-road truck driver, he hired home health care workers to care for Hardy while he was working. One of the workers, Lisa Gardner, was hired to assist Hardy when she was having seizures.

During Gardner's time as an assistant to Hardy, Domenech owned a pit bull named King. King was a muscular dog with large jaws. Domenech had a "Beware of Dog" sign on his front door. King was very protective of Domenech's family, a trait that Domenech enjoyed. King was especially protective of Hardy when she had seizures. Domenech himself had been bitten several times while Hardy was having seizures. He admitted that King was difficult to control during Hardy's seizures. King was also aggressive towards other animals. King twice fought a neighbor's dog that entered Domenech's yard. King also attacked another one of Domenech's dogs on two separate occasions. The second attack resulted in the other dog being euthanized.

Gardner originally had concerns about working around King, but she eventually grew comfortable with King. Gardner's attitude toward King changed after he bit her foot. King bit through Gardner's shoe and into one of her toes while Hardy was having a seizure. Gardner was able to pull her foot out of the shoe and get away from King. Domenech was made aware of this incident. As a result of King biting Gardner's shoe, Gardner requested that Domenech buy a muzzle for King. Domenech complied and purchased a muzzle. When the muzzle was not being used, Gardner asked that King be put in another room or taken outside while she worked. Domenech instructed Hardy to put King in a separate room or outside in his dog pen if Gardner was going to be working. Domenech instructed Hardy to put the muzzle on King when he was in the house with Gardner.

2

On July 28, 2014, Gardner was working in the Domenech home. Gardner noticed that Hardy was going into a seizure. Hardy was having a grand mal seizure. Grand mal seizures have the potential to cause serious damage. Gardner reached over to make sure Hardy was okay, but King used his head to knock her hand away. The muzzle that Domenech had purchased for King was broken and had not been used for nearly a month. Hardy's shaking then caused her to slide off of the couch and onto King, who was lying on the floor beneath her. King began to bite Hardy's legs and buttocks. Gardner was able to pull King away from Hardy. King then pulled Gardner to the ground and bit her arms and feet.

When emergency responders arrived, there were pools of blood on the floor, King was still being very aggressive, including growling, barking, and showing his teeth in a vicious manner. Ultimately, King had to be subdued with a Taser and a catchpole. Gardner had suffered major tissue damage to both her lower and upper extremities. She had also suffered significant blood loss. Gardner was transported by helicopter to Topeka for care. A helicopter is often used to transport individuals with life-threatening injuries. When the attack occurred, Domenech was working. He was approximately 200-250 miles from home.

Domenech was charged with one count of aggravated battery: reckless bodily harm, in Lyon County, Kansas. Following a bench trial, the judge found Domenech guilty of reckless aggravated battery under K.S.A. 2015 Supp. 21-5413(b)(2)(B). The trial judge noted that most of the facts leading to his determination were not in dispute. In support of his finding of guilt, the trial judge stated the following:

"As indicated by the arguments, I think everybody agrees that what this case really comes down to is recklessness, and has the State proved beyond a reasonable doubt that the defendant's actions or inactions, as it may be, were reckless?

3

"The legislature has set forth what the definition of 'reckless' should be in K.S.A. 21-5202(j). It reads as follows: . . . 'A person acts recklessly or is reckless, when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.' That's the definition I'm working with.

"There are several facts that weighed heavily on my decision here today. We have a situation where King was aggressive towards another animal, in my judgment, unprovoked on two occasions. That animal had to be euthanized as a result of the last altercation between King and [another dog]. That, in and of itself, put the defendant on some level of notice that King had the propensity to be violent, at least towards other animals.

"The rest of the evidence that we have in this case that goes towards this issue is: The testimony from the victim in this case that she had been bitten on the foot by King on a prior occasion; that the defendant, apparently at that time, recognized there was some issue relating to King because there was a discussion that culminated in the defendant giving directions that the dog be muzzled or placed in another room when [Hardy] would have seizures. If that's all we had, the Court would conclude that Mr. Domenech's actions were not reckless; however, the last phrase causes the Court some reason for pause. The last phrase in the definition is: 'which a reasonable person would exercise in this situation,' and the situation includes the reason why the victim was even at the home. The reason she was there was to take care [of Hardy].

"There was ample testimony that whenever [Hardy] would have a seizure, King had developed—I shouldn't say a practice—had gotten to the point where he would interfere with the very purpose of [Gardner] being there and that was to care for . . . [Hardy]. Oftentimes, it wasn't that big of a deal. Other care providers were able to deal with it simply by talking to King and telling King to lay down or get out of the way. For whatever reason, [Gardner], in this case, was not able to deal with King in that manner. I think this was something that was recognized by the defendant; hence, buying the muzzle and putting other safeguards in place. But when you consider what occurs when somebody's having a grand mal seizure, how chaotic that can be, and how problematic it

4

would be to deal with such a person when there is an 80- to 100-pound Pit Bull guarding that person and, in this case, beginning to bite the victim of the seizure, that in this situation, we have gone past what a reasonable person would do; therefore, I find the defendant guilty."

On June 30, 2015, Domenech was sentenced to 18 months of probation with an underlying prison term of 10 months and 12 months of postrelease supervision. At the sentencing hearing, the judge spoke on the severity of Gardner's injuries as a result of being attacked by King:

"I know at the time of trial there was a stipulation with regard to the injuries and my concern is that when this case goes up on appeal that that stipulation will not do justice to the record as to the extent of the injuries. The extent of the injuries helps one understand the nature of the recklessness in a much greater degree. All we had was the description of the officers and ambulance when they arrived and there was blood all over. My observation of the victim, when she testified, was, it was even difficult for her to get to the witness stand and she was not using her arm, could barely even bend her arm because of the injuries she'd received in [Domenech's] home, as [his] employee . . . because of the animal that [he] chose to keep, knowing that that animal had a prior history of attacking other animals unprovoked."

*Whether Sufficient Evidence Exists to Sustain Domenech's Conviction for Reckless Aggravated Battery Under K.S.A. 2015 Supp. 21-5413(b)(2)(b)*

When reviewing whether there was sufficient evidence to support a conviction in a criminal case, the appropriate standard is whether after reviewing all evidence in a light most favorable to the prosecution an appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). In determining whether there is sufficient evidence to support a conviction, an appellate court generally will not reweigh the evidence or the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016). A

5

defendant's conviction will only be reversed in rare cases where the testimony is so incredible that no reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

Domenech was convicted of reckless aggravated battery under K.S.A. 2015 Supp. 21-5413(b)(2)(B). A defendant may be convicted of aggravated battery after "recklessly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." K.S.A. 2015 Supp. 21-5413(b)(2)(B). A defendant "acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 22015 Supp. 1-5202(j).

Domenech argues that the evidence produced at trial was insufficient to sustain his conviction. Domenech contends that the evidence was not sufficient to prove every element of the crime of which he was convicted. Before trial, Domenech and the State stipulated that Gardner suffered great bodily harm. The parties also stipulated that the incident occurred on July 28, 2014, in Lyon County, Kansas. Thus, Domenech specifically argues that the State failed to establish that he acted recklessly. Domenech offers no authority in support of this contention. First, Domenech argues that he was not on notice of any substantial and unjustifiable risk because none existed. Next, Domenech argues that even if a substantial and unjustifiable risk existed, the evidence was not sufficient to support a finding that he consciously disregarded such risk.

Domenech first argues that he was not on notice that King's behavior presented a substantial and unjustifiable risk. In support of this argument Domenech asserts that the prior attacks on other dogs "did not create a substantial and unjustifiable risk that King would injure a person." Domenech's claims ignore the severity of the attacks. Domenech

6

had one of his own dogs euthanized after it had been attacked by King. King also fought a neighbor's dog for nearly 20 minutes before Domenech could break up the fight. As the trial judge noted, this fact alone does not show that a substantial and unjustifiable risk existed, but it certainly weighs in that direction when taken with other evidence presented.

Domenech argues next that the incident where King bit Gardner on the foot was only a "minor incident that would not have put Mr. Domenech on notice that King was capable of an aggravated battery on a human." Domenech also argues that "other home healthcare workers were in the home with King around the same period of time and experienced no problems." These arguments are undermined by Domenech's own admissions. Domenech admitted that when Hardy suffered from a seizure King would interfere with the individuals trying to care for her by getting in between them or nipping at their shoes. Domenech further admitted that even he had been bitten by King in his attempts to aid Hardy while she was suffering from a seizure. Thus, Domenech's claim that he was not on notice of King's behavior is repugnant to reason.

Nonetheless, Domenech argues that "[t]he record did not establish that . . . Gardner expressed her concerns about King . . . ." This assertion cannot stand in light of the fact that Gardner requested a muzzle for King and Domenech complied. Also, as was mentioned earlier, Domenech himself had experienced King's behavior. Further, Domenech was aware of the previous incident when King bit Gardner on the foot. Finally, any doubt on this point vanishes when Gardner requested that King be muzzled while she cared for Hardy.

Moreover, relating to the issue of whether Domenech was aware of the risk King posed, King was not the first dog that Domenech had rescued from an abusive home. Domenech had previously rescued a dog named Roxie. Roxie was ultimately euthanized after being deemed a vicious animal. Roxie bit a guest on Domenech's front porch. The

7

guest had come to pick up his son from Domenech's home. When the front door was opened, Roxie ran to the door and bit the guest on the leg. King also came from an abusive home before living with Domenech. Domenech testified that he was aware of King's history of abuse when he adopted him. While not all dogs react the same to being in an abusive home, the fact that Roxie and King shared similar histories put Domenech on some notice that King had the potential to behave similarly to Roxie. Even with this knowledge, Domenech only subjected King to minimal obedience training.

To sum up, when Domenech admitted that King had bitten Gardner on her foot while Hardy was having a seizure and admitted that King had bitten him while attempting to aid Hardy while she was suffering a seizure, he implicitly concedes that King would bite someone who was attempting to render aid to Hardy, especially when she was having a seizure. Combine this with Domenech purchasing a muzzle for King, it affords no basis for him saying that he lacked notice that King's behavior presented a substantial and unjustifiable risk.

Thus, Domenech's arguments that the evidence is not sufficient to sustain the finding that he was aware that King posed a substantial and unjustifiable risk must fail. Domenech was aware of King's behavior based on the surrounding circumstances and his own experiences with King. The evidence is sufficient to support a finding that Domenech was aware of a substantial and unjustifiable risk.

Domenech next argues that even if a substantial and unjustifiable risk existed, he did not consciously disregard it. Domenech notes that he purchased the muzzle for King. Domenech also points out that when King was not muzzled he was placed outside or in a separate room away from Gardner, but the muzzle had been broken for nearly a month when the attack occurred. Moreover, King was clearly not sequestered when Gardner was attacked. Domenech testified that he was planning on replacing the muzzle but failed to do so.

The trial judge noted that ultimately the determination of guilt in this case hinged on whether Domenech's actions were reckless. Again, an individual "is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2015 Supp. 21-5202(j). The trial judge made it known that he was focusing on Domenech's specific situation. The situation being that Domenech had a significant other who suffered from a medical condition requiring hired assistance and a dog that interfered when such assistance was needed.

The trial judge found that Domenech was well aware of the way King acted when Hardy was suffering from a seizure. Thus, Domenech knew that a certain result would follow from King being present during one of Hardy's seizures. Next, the trial judge found that Domenech failed to meet the standard of care which a reasonable person would exercise *in the situation* of having a significant other who suffered from seizures. Domenech admitted that the reason for Gardner being in his home was to help Hardy with her seizures. When asked how the home health care workers were supposed to assist Hardy if King would not let them get close, Domenech responded, "You've got a point." Thus, Domenech conceded that having King present would clearly frustrate the very purpose of Gardner being in his home. As a result, Domenech's argument that his actions were reasonable does not wash.

The State offers the case of *State v. Davidson*, 267 Kan. 667, 987 P.2d 335 (1999), to illustrate recklessness of a dog owner. *Davidson* may also shed light on whether Domenech disregarded the risk that King posed.

In *Davidson*, the defendant was convicted of reckless second-degree murder and endangering a child. The victim in *Davidson* was an 11-year-old boy who was killed by the defendant's Rottweiler dogs. The jury eventually found that the defendant exhibited

9

"an extreme degree of recklessness." *Davidson*, 267 Kan. at 684. The defendant had trained her dogs to be protective and aggressive. The defendant also acknowledged that her dogs got out of their enclosure frequently. Finally, on the morning the victim was killed, the defendant let the dogs out of the house and then took a sleeping pill and went to sleep. Those facts all supported the jury's finding of recklessness. Our Supreme Court noted that "the State is not required to prove the defendant knew that her dogs would attack and kill someone. It was sufficient to prove that her dogs killed [the child] and that she could have reasonably foreseen that the dogs could attack or injure someone as a result of what she did or failed to do." *Davidson*, 267 Kan. at 683.

Here, Domenech argues that he could not have anticipated the events of July 28, 2014, because he was 250 miles away. In the same vein, Domenech argues that Gardner had interacted with King many times without incident. Much like the defendant in *Davidson*, though, the evidence establishes that Domenech should have foreseen that King could attack or injure Gardner when she was giving aid to Hardy. Moreover, similar to *Davidson*, one could analogize taking a sleeping pill with being 250 miles from home. Both situations present individuals who were unable to exhibit control, whether by mental incapacitation or by physical impossibility. While the standard for our case of aggravated battery is different than the charge of reckless second-degree homicide in *Davidson*, it still provides us with guidance. The State did not need to show that Domenech knew King was going to attack Gardner on July 28, 2014. The State only needed to present sufficient evidence to show that Domenech consciously disregarded a substantial and unjustifiable risk and that doing so was a gross deviation from the standard of care a reasonable person would exercise in that situation. K.S.A. 2015 Supp. 21-5202(j). The evidence presented showed that Domenech was aware of King's behavior during Hardy's seizures. The evidence also showed that Domenech was aware of the frequency with which Hardy suffered from seizures. Thus, Domenech could have reasonably foreseen that King could attack Gardner while she was providing care for Hardy.

10

The fact that Domenech was 250 miles from home is of no consequence. What matters is that Domenech consciously disregarded a substantial and unjustifiable risk and acted in a way inconsistent with that of a reasonable person in his situation. The evidence was sufficient to show that Domenech was aware of the risk King posed and did consciously disregard that risk. In doing so, Domenech failed to act as a reasonable person would in his situation. Domenech argues that the trial court failed to make clear what a reasonable person would have done in his situation. The most reasonable solution in his situation would have been to remove King from the home. Obviously, King's presence in the home frustrated the care that Gardner could provide Hardy when she was suffering a seizure. At the very least Domenech could have put more effort into training King or kept King in the outdoor pen whenever Gardner came to work. The fact that the trial court did not inform Domenech what a reasonable person would do, however, does not weigh on our review. Domenech has challenged the sufficiency of the evidence supporting his conviction. Thus, the only question is whether sufficient evidence existed to support the trial court's determination of guilt.

Viewing the evidence presented in the light most favorable to the State leads to the conclusion that the trial judge's determination of guilt was supported by sufficient evidence. Based on the evidence presented a rational factfinder could have found Domenech guilty beyond a reasonable doubt. Accordingly, we affirm the trial court's decision.

Affirmed.